**Diane L. MOODY, Appellee**

v.

**Donald A. MOODY, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 15, 2003.

Filed April 9, 2003.

Robert C. Houpt, West Chester, for appellant.

Ann E. Endres, Reading, for appellee.

Before: STEVENS, GRACI, and OLSZEWSKI, JJ.

OLSZEWSKI, J.

¶ 1 This is an appeal from the order of court entered on July 15, 2002, dismissing appellant's exceptions. We reverse.

¶ 2 The facts of this case as stated by appellant are as follows:

Donald Moody (Appellant/Defendant) and Diane Moody (Appelle/Plaintiff) were married on November 3, 1981. (R.110a, N.T. p 7) On February 18, 1983, Mrs. Moody gave birth to a son, Donald, and approximately two years later on January 13, 1985, gave birth to a second son, named David. (R.110a, N.T. p 8) In July, 1985, after discussions with his wife and with her agreement, Defendant underwent a vasectomy which resulted in his sterility and inability to procreate. (R.110a, N.T. p 8) The decision to have a vasectomy was based in part upon the parties desire not to have any more children and in part because of the Plaintiff's infidelity and attendant strain on the marriage as a result of Plaintiff's infidelity. (R.111a, N.T. p 9) To date, Defendant is unable to father a child. (R.111a, N.T. p 10)

In the early fall of 1988, the parties separated during which time Defendant lived with the sons, Donald and David, and Plaintiff moved in with an adult male whose identity was unknown to Defendant and is still unknown to Defendant. (R.111a, 118a, N.T. p 11,40) Plaintiff returned to the marital home during the spring of 1989 and the parties attempted a reconciliation which was unsuccessful. (R.111a, N.T. p 11) When Plaintiff returned to the marital home, she was pregnant, however, she did not disclose that fact to Defendant. (R.111a, N.T. p 12) The parties did not engage in sexual intercourse during the period of attempted reconciliation and when she could no longer conceal her pregnancy from Defendant, Plaintiff ad-

mitted that Defendant was not the father. (R.111a, 118a, 120a, N.T. p 11–12, 40, 48) Despite repeated requests by Defendant, Plaintiff continues to refuse to identify the father of Deanna. (R.121, a, N.T. p 51) Although the parties continued to live together through the summer of 1989, they did not live together as husband and wife. (R.111a, N.T. p 11) Defendant did support Plaintiff physically, emotionally, and financially, however, the parties concluded that the marriage was irretrievably broken and that reconciliation was impossible. (R.111a, 112a, 113a, 115a, 116a, N.T. p 12–13, 18–19, 28–30) Shortly after Deanna's birth on August 26, 1989, Defendant moved from the marital residence and saw sons on a limited basis. (R.112a, 113a, N.T. p 13, 18–19) In January, 1992, Plaintiff filed an action in divorce. (R.119a, N.T. p 43) Shortly before the divorce action was filed, the parties executed a post nuptial agreement which provided for the payment of child support for the "parties' minor children" and in its introductory paragraph identifies Deanna as a child of the marriage. (R.112a, 121a, 64a–79a, N.T. p 14–15, 49) Prior to the filing of the divorce action, Plaintiff gave birth to another child, Darlene Moody, sometime in 1992, however, no reference is made to her specifically in the agreement. (R.110a, 121a, N.T. p 6, 49)

Initially, after separation in 1989 and up until 1995, Defendant had limited contact with Donald and David. (R.113a, N.T. p 18–19) Sometimes those visits would include Deanna and sometimes those visits would include both Deanna and Darlene. (R.120a, N.T. 47–48) In 1995, at the insistence of the Plaintiff, all visitation and contact with any of the children was terminated. (R.113a, N.T. p 19) Plaintiff has repeatedly admitted

that Defendant is not the father of Deanna. (R.112a, 118a, N.T. p 13, 40) After Deanna's birth, Plaintiff told Defendant that she was taking the children to see their grandparents, however, none of those visits ever included Defendant's parents. (R.114a, N.T. p 21)

Defendant did not take Deanna to doctor visits or perform other parental care functions. (R.112a, N.T. p 13) Defendant and Deanna have not exchanged birthday or Christmas presents. (R.113a, N.T. p 19–20) Defendant had not attended any of Deanna's school functions and, in fact, does not know where she goes to school. (R.113a, N.T. p 20) They have never taken a vacation together. (R.113a, N.T. p 20) Defendant has never claimed Deanna as a dependant on his income tax returns. (R.117a, N.T. p 34) In fact, there is no evidence that other than being present at the hospital at the time of her birth, has defendant ever held Deanna out to others as his child. (R.114a, N.T. p 21) Even Cheryl Shurilla, who testified for the Plaintiff, admitted that Defendant had a vasectomy and that she knew he was not the father. (R.118a, N.T. p 38–39)

When Plaintiff initiated an action for child support, Defendant went to the Domestic Relations Office of Berks County, Pennsylvania, and told them that he denied being the father of Deanna. (R.112a, 113a, 117a, N.T. p 16–18, 35–36) He was advised by the Domestic Relations Office officials that he could not deny paternity because the child was born before the parties were divorced. (R.112a, 113a, 117a, N.T. p 16–18, 35–36) When Defendant met with Plaintiff's attorney to sign the post nuptial agreement, drafted by Plaintiff's attorney, Defendant again denied being the father of Deanna, and was advised by Plaintiff's attorney that whether or not he was the biological father was irrelevant and he would have to pay child support for all three children. (R.112a, N.T. p 14–15) Whenever Defendant was required to go to the Domestic Relations Office concerning modification of the Order or arrearage he repeatedly questioned his status as a parent of Deanna and was repeatedly told that he could not challenge that finding. (R.112a, 113a, N.T. p 16–17) At no time, did Defendant ever appear at a hearing or before a Judge where he could raise the issue of paternity. (R.113a, N.T. p 17) Defendant did execute a consent agreement regarding the amount of support to be paid and that agreement does list Deanna as one of his dependents. (R.113a, N.T. p 17)

**Procedural History**

Donald Moody filed an Application to Modify the Existing Support Order in January, 2001. (R.14a) The Petition to Modify was amended and the matters were consolidated for trial. (R.23a–32a) The court granted Appellant leave to challenge paternity, regarding Deanna, on August 8, 2001. (R.33a) After hearing, the court denied Mr. Moody's challenge to paternity by Memorandum and Order dated November 27, 2001. A support hearing on the Petition to Modify was held on December 6, 2001. (R.130a–178a) Appellant filed Exceptions to the Support Hearing and Recommendations of the Domestic Relations Hearing Officer. (R.85a–108a) The lower [court] dismissed the Exceptions by Order and Memorandum dated July 15, 2002 and August 2, 2002, respectively. This appeal was timely filed by Stipulation and Order dated March 1, 2002. (R.82a–84a) At no time prior to the proceedings commenced in 2001 was Appellant represented by counsel.

Appellant's brief, at 5–9.

¶ 3 Appellant raises two issues on appeal.

A. Did the court commit an error of law or an abuse of discretion in substituting the legal fiction of paternity instead of the biological reality of non-paternity when there was no relationship between Appellant and the child, no family unit to protect and Appellee, although admitting that Appellant is not the father of the child, refuses to disclose the identity of the child's biological and legal father?

B. Is Appellant estopped from denying paternity when he relied on the representations of the Domestic Relations Office and Appellee's attorney that he could not deny paternity because birth occurred prior to divorce?

Appellant's brief, at 4.

¶ 4 Appellant argues that he should not be responsible to pay support for Deanna. He cites to *Kohler v. Bleem,* 439 Pa.Super. 385, 654 A.2d 569 (1995). In *Kohler,* Mrs. Kohler conceived a child after Mr. Kohler underwent a vasectomy. Mrs. Kohler admitted that Mr. Kohler was not the father of the child, stating that the father was a stranger from another city. Mr. Kohler stayed with Mrs. Kohler and held himself out as the father of the child. Five years later, Mr. Kohler found out that the father was his next door neighbor, Mr. Bleem. One year later, Mr. Kohler left the marriage. Mrs. Kohler filed for support from the biological father. Mr. Bleem added Mr. Kohler as an additional defendant. Blood tests were performed and it was confirmed that Mr. Kohler was not the father. The matter proceeded to trial where the court held that Mr. Kohler was responsible for support of the child. On appeal from the support order, this Court found that Mr. Kohler's vasectomy was clear and convincing evidence that Mr. Kohler was not the father and therefore he rebutted the presumption that a child born of a marriage is a child of the parties within the marriage. Further, we found that paternity by estoppel did not apply because Mr. Kohler held the child out as his own under the misrepresentation that the father was unknown.

¶ 5 The *Kohler* case is different from the instant case. Here, appellant voluntarily entered into a support order that included Deanna. No appeal was taken from this order. Therefore, we seek guidance in the case of *Manze v. Manze,* 362 Pa.Super. 153, 523 A.2d 821 (1987). In *Manze,* the parties were married at a time when Mrs. Manze was three and one-half months pregnant. Months later, Mrs. Manze gave birth to a daughter, Deborah. Ten years later, the parties separated. The parties entered into an agreed order, which included support of the child. Two years after signing the order, Mr. Manze remarried and tried unsuccessfully to have children. He learned that he was unable to father a child. Upon learning this information, he filed a motion to vacate the support order for Deborah. Blood tests were performed and it was confirmed that Mr. Manze was not the father of Deborah. After a hearing, the trial court found that *res judicata* and equitable estoppel precluded appellant (Mr. Manze) from denying paternity. On appeal, we affirmed.

¶ 6 Appellee argues that this case is much like that of *Manze* in that under the doctrine of *res judicata,* appellant is precluded from denying paternity. Under *Manze,* a support order necessarily determines the issue of paternity. *Id.* at 824 (other cites omitted). "To challenge paternity, an appeal must be taken directly from the support order itself. Absent any appeal, the issue of paternity is established as a matter of law." *Id.* (other cites omitted).

¶ 7 Appellee's argument is that the issue of paternity was determined when the parties entered into the agreed order on Janu-

ary 13, 1992, and no appeal was taken. It was not until January 2001 when appellant filed for a modification. At this time, it was too late for appellant to challenge paternity as he was barred by the doctrine of *res judicata*.

¶ 8 However, *Manze* is different from the instant case in that appellant was misled at the time he signed the agreed order and further he was misled by the Domestic Relations Office officials. He was told by appellee's attorney at the time the order was presented to him and also by the DRO that he cannot argue paternity because the child was born before the parties divorced. This is the reason he signed the agreed order.

¶ 9 We find that we cannot apply the doctrine of *res judicata* or the doctrine of estoppel because appellant was misrepresented by the officials at the Domestic Relations Office. There is clear and convincing evidence that the child is not appellant's. Appellant had a vasectomy before the child was conceived. Further, at the time the child was conceived, Mr. Moody did not have access to Mrs. Moody as she was living with another man. Appellant has not held this child out as his own; in fact, he left the marital residence soon after the child was born. Appellee has continuously stated that appellant is not the father of Deanna. There is no intact marriage to protect here nor do we need to consider the child's relationship with appellant, as there is none. We reverse the decision of the trial court and find that appellant should not be responsible for support of Deanna.

¶ 10 Order REVERSED. Jurisdiction relinquished.

¶ 11 Judge GRACI files a Dissenting Opinion.

GRACI, J, Dissenting.

¶ 1 I must respectfully dissent, as I would affirm the trial court's finding that appellant is now precluded from denying paternity under the doctrine of *res judicata*.

¶ 2 As the majority points out,

a support order necessarily determines the issue of paternity. To challenge paternity, an appeal must be taken directly from the support order itself. Absent any appeal, the issue of paternity is established as a matter of law. "( [A] ) relevant fact necessarily determined as a prerequisite to the entry of an original support order may not, under the doctrine of res judicata, be challenged or put at issue in any subsequent proceeding."

*Manze v. Manze*, 362 Pa.Super. 153, 523 A.2d 821, 824 (1987) (citations omitted).

¶ 3 In the instant case, the parties voluntarily entered into a post-nuptial agreement in January, 1992, which provided for the payment of child support for the parties' minor children, including Deanna. A support order was also entered directing appellant to pay child support, thereby establishing the issue of Deanna's paternity as a matter of law. At the time of these events, appellant was well aware that he was not Deanna's biological father. Appellee had repeatedly informed him of that fact and, additionally, appellant had undergone a vasectomy four years before Deanna was born. Appellant executed the post-nuptial agreement under these circumstances, failed to pursue an appeal from the subsequent support order, and then abided by the terms of that order for more than a decade. Under the doctrine of *res judicata*, he may not now challenge paternity.[1]

---

1. It is of no consequence that the parties

entered into a support agreement without a

¶ 4 "Allegations of fraud or mutual mistake [ ] provide the only bases upon which a court [can] review" a final support order. *R.J.K. v. B.L.*, 279 Pa.Super. 71, 420 A.2d 749, 751 (1980). *See also Gardner v. Gardner*, 371 Pa.Super. 256, 538 A.2d 4, 9 (1988), *reargument denied.* Appellant's petitions to modify the support order alleged neither fraud nor mutual mistake. Instead, appellant argued that he agreed to the 1992 support order based upon misrepresentations made by employees of the Berks County Domestic Relations Office ("DRO") and appellee's attorney. It is doubtful in the first instance that these alleged misrepresentations rise to the level of fraud or mutual mistake.

¶ 5 "The test for fraud is: (1) a misrepresentation, (2) a fraudulent utterance, (3) an intention by the maker that the recipient will thereby [be] induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result." *Sekol v. Delsantro*, 763 A.2d 405, 411 n. 7 (Pa.Super.2000) (citation omitted). In contract law, a mutual mistake exists where " 'both parties to a contract [are] mistaken as to existing facts at the time of execution.' ... If a mistake is not mutual but unilateral and is not due to the fault of the party not mistaken, but to the negligence of the one who acted under the mistake, it affords no basis for relief in rescinding the contract-release." *Smith v. Thomas Jefferson University Hospital*, 424 Pa.Super. 41, 621 A.2d 1030, 1032 (1993), *appeal denied*, 535 Pa. 638, 631 A.2d 1009 (1993) (citations omitted).

¶ 6 On this limited record, I fail to see how the misrepresentations of which appellant complains could be construed as the result of fraud or mutual mistake. There is no evidence that the DRO officials or appellee's attorney made misrepresentations or fraudulent utterances to appellant concerning the law of paternity as it stood in 1992. Nor has appellant demonstrated his justified reliance upon those statements. In fact, under the definition of unilateral mistake set forth above, there is a strong argument that appellant, who chose to execute the support agreement without representation of counsel, did so negligently. At the very least appellant did so voluntarily, and with full knowledge of Deanna's paternity. Moreover, cases involving fraud or mistake concern the actions of the parties to an agreement—in this context, the biological and putative parents. In this case, it is undisputed that one of those parties, appellee, has been forthright about Deanna's paternity since her birth. Appellant would have us extend privity of the parties' support agreement to include third-party public employees and appellees' attorney, and I find no basis for doing so.

¶ 7 Assuming arguendo that the misrepresentations alleged here can somehow be construed as fraud or the result of a mutual mistake between the parties, it is well settled that a party asserting either type of claim must offer "evidence that is clear, precise and convincing." *Sekol*, 763 A.2d at 411 n. 7 (discussing burden on party alleging fraud or intent to defraud); *Smith*, 621 A.2d at 1032 (discussing burden on party claiming mutual mistake). Appellant has fallen far short of this burden since he has failed to offer any evidence, except for his own recollections of meetings that occurred a decade ago, to sup-

formal judicial proceeding. When presented with a similar factual scenario, this Court has held, "[t]he fact that both support orders were consensual and not the result of a full eviden-

tiary hearing makes them no less final and no more subject to challenge." *R.J.K. v. B.L.*, 279 Pa.Super. 71, 420 A.2d 749, 751 (1980).

port what are essentially bald, self-serving allegations.[2]

¶ 8 For the reasons set forth above, I would affirm the order of the trial court dismissing appellant's exceptions.

---

**2.** The same burden of proof would apply to appellant's argument against application of paternity by estoppel. *Sekol v. Delsantro,* 763 A.2d 405, 410 (Pa.Super.2000) ("since Appellant is seeking to inject elements of fraud and/or misrepresentation pertaining to alleged conduct of both mother and Appellee [ ], that this evidence must be considered by the trial court in whether to apply paternity by estoppel."). *See also Kohler v. Bleem,* 439 Pa.Super. 385, 654 A.2d 569 (1995). In *Sekol,* this Court determined that there was insufficient evidence before the trial court to support a finding that paternity by estoppel was applicable in that case. *Sekol,* 763 A.2d at 411. We remanded for an evidentiary hearing "giving due consideration to the claims of estoppel and the interplay of the alleged fraud/misrepresentation[.]" *Id.*